519 So.2d 817 (1988)
Judy M. TEAGUE
v.
Alfred M. BARNES, Jr., et al.
No. 87-CA-375.
Court of Appeal of Louisiana, Fifth Circuit.
January 11, 1988.
Rehearing Denied February 17, 1988.
*818 William R. Brough, Brough & Livaccari, New Orleans, for defendants/appellants.
Gregory C. Champagne, Luling, for plaintiff/appellee.
Kenneth C. Hughes, James Ryan, New Orleans, for third party defendant-appellee.
Before BOWES, GAUDIN and GOTHARD, JJ.
BOWES, Judge.
This is a lawsuit by a tenant against her landlord for injuries sustained in a slip-and-fall accident on the rented premises. Following a non-jury trial, the district court awarded judgment for the tenant in the amount of $474,484.04 (comprising $24,395 for past lost wages, $40,089.04 for past medical expenses, $10,000 for future medical expenses, and $400,000 for general damages.) The landlord and its insurer have appealed.
The appellants assert several assignments of error, which may be consolidated into three major issues: (1) whether the trial court erred in failing to find the plaintiff comparatively negligent; (2) whether the trial court erroneously admitted and considered certain evidence; (3) whether the trial court abused its discretion in the award of general damages.
The appellee has answered the appeal, asserting the trial court erred in failing to award her damages for future loss of earning capacity.

FACTS
The accident occurred on May 10, 1983, when Judy M. Teague and her family were tenants of the Lakewood West Apartments *819 in Luling, Louisiana, under a lease with Apartment Rental Consultants, Inc., d/b/a Trademark Property Management.[1] The resident manager of the apartments was Pam Sargent, whose husband, Tom Sargent, performed the maintenance and repairs. The Sargents were employed by Trademark.
Two days earlier, Mrs. Teague had notified Tom Sargent that the downstairs toilet was leaking water from its base and also that a fuse needed to be replaced. Sargent promised her he would repair it promptly. He replaced the fuse that evening and told Mrs. Teague he would come back the next day to repair the toilet.
He did not appear as promised the following day, May 9th, so Mrs. Teague contacted him again and he told her he would repair it first thing the next morning. Mrs. Teague, who worked a night shift, told him to let himself in to make the repair while she was sleeping. (He had done this in the past to make other repairs.)
The next day, she awoke about 1:30 in the afternoon and went downstairs to get something to eat. Assuming that Mr. Sargent had repaired the leaky toilet, she went into the downstairs bathroom, but immediately felt water still on the floor. Mrs. Teague knew at once Sargent had not made the repair. Simultaneously, the telephone rang and she turned to exit the bathroom to answer it. As she turned, her foot slipped on the wet floor and she fell hard on her left side, resulting in the injuries made the basis of this suit.
The injury initially diagnosed was a fracture of the fifth metatarsal bone of the left foot, which was treated by Dr. Ralph Gessner. Although it healed without unusual complication, more than a year after the accident Mrs. Teague (who was then 34 years of age) still complained of occasional pain in the ankle. Dr. Gessner stated this was to be expected, not only because fractures of the 5th metatarsal are very painful but also because arthritic changes inevitably develop at the site of a fracture.
On her second visit to Dr. Gessner for her foot, Mrs. Teague complained of pain in her left elbow. At the time Dr. Gessner diagnosed this as only a contusion to the olecranon process (the tip of the elbow). The elbow, however, subsequently became plaintiff's major and continuing complaint.
Several visits later, palpation revealed a floating object under the surface of the skin at the elbow. Plaintiff's complaints of elbow pain continued on each visit. On June 27, 1983, Dr. Gessner performed surgery, removing a fragment of cartilaginous material.
Although the elbow incision appeared to heal well following the surgery, Mrs. Teague continued to complain of pain. Eventually Dr. Gessner diagnosed chronic olecranon bursitis. On September 16, 1984, plaintiff underwent surgery to excise the olecranon bursa.
Although the incision again healed with no evidence of infection, plaintiff continued to complain extensively of pain in the elbow. Nerve conduction studies showed no nerve involvement. The elbow became swollen and inflamed from time to time and plaintiff complained of numbness in portions of her left hand. She was treated with antibiotics and cortisone injections, to no avail.
On December 18, 1984, Dr. Gessner performed surgical re-exploration of the elbow, excising scar tissue that had built up at the site. Again the incision healed well, but over the succeeding months plaintiff continued to suffer periodic flareups of elbow inflammation and reiterated her complaints of pain and numbness in the hand. During this time she continued to take oral antibiotics and anti-inflammatory pain medication.
*820 In June 1985 plaintiff moved to Lake Charles due to a job transfer. During the summer a pocket of fluid formed on her elbow that turned red and occasionally drained fluid. She saw a Dr. Lavoy in Lake Charles, who treated her with antibiotics and pain medication. In October 1985 she suffered an episode of acute inflammation of the elbow; Dr. Gessner prescribed antibiotics and told her not to work.
Although plaintiff returned to Luling occasionally to see Dr. Gessner, the distance made frequent trips difficult so Gessner referred her to a physician in Lake Charles, Dr. Washington. In November 1985, Dr. Washington performed surgery to open and drain the elbow; he diagnosed a staph (staphylococcus) infection and treated plaintiff with intravenous antibiotics.
While hospitalized for this surgery, plaintiff testified, she suffered an allergic reaction to a medication and underwent a proctoscopic examination because she had developed diarrhea. She was hospitalized for 14 days; a few days after her release, the infection recurred and she was hospitalized again. Dr. Washington reopened the incision and left it open; plaintiff thereafter underwent several weeks of whirlpool therapy.
In early December 1985, Mrs. Teague was on a visit to Houston, Texas, when her arm swelled again and began draining. She saw a Houston physician, Dr. Gary Gartsman, who told her she had a very serious infection that required immediate hospitalization.
On December 17, 1985, plaintiff underwent surgery by Dr. Gartsman, involving a complete soft tissue excision and excision of the bony tip of the olecranon. Dr. Gartsman consulted Dr. Tobias Samo, a specialist in infectious diseases, who determined that plaintiff had a methicillan-resistant staph infection and osteomyelitis, a bone infection.
Because treatment required high doses of intravenous antibiotics for an extended period, a Hickman catheter was implanted in plaintiff's chest to enable self-administration of the medication at home. The Hickman catheter tunnels a short distance underneath the skin, usually on the chest, and enters a large vein in the upper portion of the chest. The patient injects the antibiotic directly into the chest.
After her discharge from the hospital, plaintiff was required to administer the antibiotic (Vancomycin) to herself. In self-administration, the patient first flushes the tube by injecting saline solution, then attaches a drip bag of the antibiotic to the catheter. The medication takes about an hour to drip in. Afterward the patient flushes the tube again with saline, then injects an anti-coagulent drug to prevent clotting. Mrs. Teague was required to perform this procedure every six hours for six weeks.
The Vancomycin therapy successfully quelled the staph infection. The catheter was removed in early February 1986, although the valve at its base was left in Mrs. Teague's chest, to be available if she has a recurrence of the infection. She returned to work on February 17, 1986.
By the time of trial (November 1986) the infection had not recurred. Mrs. Teague testified that she still had a little redness on the elbow and that her arm continued to bother her "a whole lot." She testified that she had been unable to resume many activities formerly a part of her life, such as tennis, bicycling and jogging, or routine housework, such as mopping, because of the discomfort to her arm. She wears a padded bandage constantly because she "can't stand" any pressure on her elbow. She experiences great anxiety worrying about the infection recurring. The problems with the elbow and her emotional reactions have placed great strain on her relationship with her husband. She cannot participate in recreational activities with her family in the way she did before the accident.
Dr. Gessner assigned Mrs. Teague a 15% anatomical disability in the left elbow, estimating this would be equivalent to a 40% functional disability in any work involving lifting, pushing or pulling of weights greater than 20 pounds on a repetitive basis. He felt she had been honest about the pain *821 she suffered and that the elbow is a significant problem.
Dr. Gartsman estimated plaintiff's permanent anatomical disability at 0-5%. He stated there is a low possibility she will have a recurrence and require another excision, but said she may continue to have problems of pain and irritation in using her elbow. He noted her strength and gripping ability in the left arm are about half of normal.
None of the doctors could pinpoint the cause of the staph infection. Dr. Samo noted that staph bacteria can be long-dormant and that bacteria already in plaintiff's body may have been activated by the recurring inflammation to her elbow. Further, he said, the several surgeries are predisposing factors to infection.
Plaintiff testified she had developed blackening of her teeth and had experienced dark fluid dripping from her breasts; she attributed these to the Vancomycin therapy. Dr. Samo stated, however, that although Vancomycin may have potentially serious side effects on the hearing and the kidneys, the symptoms reported by Mrs. Teague are not among the known reactions. He ruled them out unequivocally as side effects of Vancomycin.
Plaintiff also testified that, apart from the continuing problems with her elbow, in September 1985 she twisted her knee while on the job. Because the ligaments were torn, she underwent knee surgery and was off work for 25 weeks following that injury, receiving worker's compensation. It was during that time she had the surgery in Houston. In addition, about a month before the trial of this case Mrs. Teague had undergone a hysterectomy. Plaintiff has made a weak attempt to relate the gynecological complaints to the Vancomycin therapy, but it is clear that neither the knee injury nor the gynecological problems can be linked to the accident made the basis of this suit.
Mrs. Teague testified further that, while off work in the weeks immediately following the accident involved here, she received 60% of her salary. At the time of the accident she was earning $4.00 an hour as a cashier-checker at Delchamps. Subsequently she received promotions and pay raises; at the time of trial she was an assistant manager, earning $11.00 an hour. She stated she receives a raise after every 1,000 hours of work.
Mrs. Teague's husband and daughter testified to the changes in her emotional behavior and activity level since she developed the elbow problems. They said she cries a lot and cannot participate in sports and other activities as she had prior to the injury. Mr. Teague stated that his relationship with his wife has become strained and they have grown apart. He attributed this to the depression, pain and inactivity forced upon her by the elbow problems.
By the time the trial took place, Pam and Tom Sargent were no longer employed by defendant Trademark and had moved out of Louisiana. The defendants called no witnesses and presented no evidence in their own behalf.

VALIDITY OF JUDGMENT ON APPEAL
At the outset we note a problem not addressed by the parties: the trial judge made a substantive correction in the original judgment without any party's filing a motion for new trial. The original judgment, rendered on February 24, 1987, was against Apartment Rental Consultants, Inc. d/b/a Trademark Property Management anderroneouslyCommercial Union Insurance Company. In fact, Commercial Union was never a party to this suit. Although the record contains no motion for new trial to correct the name of the insurance company, on March 19, 1987, the district court rendered an amended judgment, in which Commercial Union was replaced by American Employer's Insurance Company. On March 20, 1987, American Employer's appealed both the February 24th and the March 19th judgments.
LSA-C.C.P. art. 1951 provides,
A final judgment may be amended by the trial court at any time, with or without notice, on its own motion or on motion of any party:

*822 (1) To alter the phraseology of the judgment, but not the substance; or
(2) To correct errors of calculation.
Changing the name of a party cast in the judgment is a change of substance and not of phraseology; as such, although the error is obvious, it cannot be accomplished by ex parte motion, but may properly be done contradictorily. See Mitchell v. Zeringue, 497 So.2d 19 (La.App. 5 Cir. 1986); Levy v. Stelly, 230 So.2d 774 (La. App. 4th Cir.1970). That is, the change may be sought either by motion for new trial or by appeal.
The usual remedy of the appellate court in such a case is to vacate the amended judgment and reinstate the original judgment. See Schexnayder v. Schexnayder, 503 So.2d 104 (La.App. 5 Cir.1987); Mitchell, supra; Williams v. Payne & Keller, Inc., 442 So.2d 1207 (La.App. 5 Cir. 1983); Levy, supra.
According to LSA-C.C.P. art. 2164, "[t]he appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." Here, the parties neither moved for a new trial in the district court nor contested the amended judgment in this court. American Employer's Insurance Company's appeal was from both judgments, however.
On the record on appeal, therefore, we deem it just, legal and proper not only to vacate the amended judgment and reinstate the original judgment, but also to revise the original judgment to delete Commercial Union Insurance Company, adding in its place the proper party defendant, American Employer's Insurance Company.

LIABILITY
The defendants do not contest their liability, as lessors, for defects in the premises. LSA-C.C. arts. 2322, 2695. However, they assert that Mrs. Teague was comparatively negligent, arguing that she was aware of the leaking water yet failed to take sufficient precautions to avoid the accident. They contend her award should be reduced accordingly. LSA-C.C. art. 2323.
We find no merit to this argument. Mrs. Teague testified she stuffed towels around the base of the toilet from the time she discovered the leak, replacing them when they were soaked. On the day of the accident she was relying on Mr. Sargent's assurance he would come to repair the toilet while she slept. When she stepped into the bathroom that afternoon and felt the water on her foot, the telephone rang and she turned to answer it, resulting in her fall. Under these circumstances, we find no error in the trial court's determination that she was not negligent.

EVIDENTIARY RULINGS
Defendants take issue with the rulings of the trial judge allowing the in globo admission of plaintiff's medical bills and favoring the credibility of the plaintiff.
Regarding the medical bills, defendants objected at trial to their admission and reiterate the objection in their brief to this court. Their statement of the reasons for the objection is vague, however, and they fail to cite specific codal, statutory or jurisprudential authorities.
As far as we can tell, the major objection is that plaintiff failed to prove she paid the bills herself; many of the bills were paid by plaintiff's hospitalization insurer. Defendants argue she cannot recover for anything she herself did not pay, that such recovery would constitute "double-dipping."
That argument is meritless. "An injured party is entitled to damages for past and future pain and suffering, loss of past and future earnings, permanent disability and incurred related medical expense where such damages are supported by competent evidence." Reeves v. Louisiana and Arkansas Railway Co., 304 So.2d 370, 375 (La.App. 1 Cir.1974), writ denied, 305 So.2d 123. It is well-settled that a plaintiff's tort recovery is not diminished by payments made through insurance benefits received from other collateral sources independent of the tortfeasor's procuration or contribution, and such payments may not be credited against the personal injury *823 award. Bennett v. U.S. Fid. & Guar. Co., 373 So.2d 1362 (La.App. 1 Cir.1979); Wallace v. Pan American Fire & Cas. Co., 352 So.2d 1048 (La.App. 3 Cir.1977), writ denied, 354 So.2d 209.
Defendants' next objection to the medical bills is that some of the bills may stem from medical treatment plaintiff underwent for the knee injury or for her hysterectomy. Correspondingly, defendants seem to be objecting to plaintiff's method of introducing the bills: Mrs. Teague's attorney did not call the health care providers who had generated the bills to identify them. Rather, he produced the bills, grouped in six separate packets, and asked plaintiff if she had reviewed them and if they were the bills resulting from the injuries sued upon. She responded affirmatively.
As far as we can ascertain from the appellants' vague arguments in their brief, they are challenging both the procedural method of introducing the bills into evidence and the relevance of the bills to the injuries involved here.
Where the plaintiff's testimony that he incurred a medical bill is supported by the bill, absent sufficient contradictory evidence or reasonable suspicion that the bills are unrelated, it is sufficient to support the inclusion of that item in the judgment. The test is whether it is more probable than not that those items result from the accident made the basis of the suit. See Villetto v. Weilbaecher, 377 So.2d 132 (La. App. 4 Cir.1979); Rue v. State, Dept. of Highways, 376 So.2d 525 (La.App. 3 Cir. 1979).
A party may prove the amount of damages or expenses
to which he is entitled by testimony that he has paid the amounts, corroborated by introduction into evidence of the bills paid and identification of them as expenses incurred because of the opponent's default, without necessarily being required to introduce testimony of those who performed the work or repairs for which he paid. [Citations omitted.] Such receipts so identified may be accepted as sufficiently proving the claim in the absence of contradictory evidence or other reason casting suspicion upon the amounts so proven.
Trinity Universal Insurance Company v. Normand, 220 So.2d 583, 586 (La.App. 3 Cir.1969).
The defendants have made no attempt, either at trial or before this court, to point out specific charges they challenge, or to present evidence contradicting plaintiff's assertion that all the bills relate to treatment for the elbow and ankle injuries. The trial judge stated, in his reasons for judgment, that he had carefully reviewed the medical bills, had compared them with the evidence, and found that all the bills are "relevant and material to the damage suit."
In addition, our own review of the medical bills, receipts and other documents offered by plaintiff does not disclose any manifest error in the trial judge's conclusion that all the medical bills presented are related to the injuries involved in this suit. Accordingly, we find no abuse of discretion by the trial judge in accepting the bills into evidence or in the award for past medical bills.
Appellants have not challenged the awards for future medical bills or for past lost wages; accordingly, we shall not review those.
The defendants also attack the plaintiff's credibility. They point out her testimony that she felt her dental and gynecological problems were related to the lengthy Vancomycin therapy for the staph infection in her elbow, despite her doctors' negation of any connection. Defendants assert that plaintiff has exaggerated her injuries in general and they challenge whether the claimed accident occurred at all.
Dr. Gessner, who saw plaintiff on more occasions than any of the other doctors, testified he felt plaintiff's complaints were sincere; he found no evidence of malingering. The trial judge stated he believed plaintiff's subjective complaints are real. The defendants presented no evidence to contradict plaintiff's testimony, either as to the accident itself or the resulting medical problems, and their attempts to impeach *824 the plaintiff on cross-examination were unsuccessful.
A reviewing court must give great weight to the conclusions of the trier of facts, and should not disturb reasonable evaluations of credibility and reasonable inferences of fact, even though other evaluations and inferences are as reasonable. Aleman v. Lionel F. Favret Co., Inc., 349 So.2d 262 (La.1977). Accordingly, we find no basis on which to disturb the trial judge's ruling on credibility in this case.

GENERAL DAMAGES
Last, appellants contend the trial court abused its discretion in awarding Mrs. Teague $400,000 for her pain and suffering.
In making that award, the trial judge stated, in his reasons for judgment, "During the liability stage, I find the plaintiff free from fault. Based upon the evidence adduced, the injuries sustained, the past, present, and future pain suffered by plaintiff, it is the opinion of this Court that an award of $400,000.00 is appropriate. * * *."
LSA-C.C. art. 2324.1 provides, "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Before a court of appeal can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making the award. Perniciaro v. Brinch, 384 So.2d 392 (La.1980).
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive.
* * * * * *
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's "much discretion," * * * in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive * * * or insufficient * * *.
Reck v. Stevens, 373 So.2d 498, 501 (La. 1979).
Considering the foregoing principles, we have carefully reviewed the award of $400,000 in general damages to the plaintiff.
As a result of this accident, she suffered a fractured metatarsal that required six weeks in a cast and caused her discomfort for more than a year after the accident. She suffered a contusion to the olecranon process of her arm, resulting in chronic olecranon bursitis, and eventually developed a stubborn staphylococcus infection. She underwent five separate surgeries to her elbow, as well as surgical implantation of a catheter in her chest, and was required to self-administer a strong antibiotic intravenously six times a day for six weeks. She continues to experience pain and redness in the affected elbow and cannot use it without pain. The anxiety and pain she has undergone as a result of the elbow injury have prevented her from performing many of her former activities and have caused her relationships with her husband and children to deteriorate.
Plaintiff was unable to work for many weeks while recovering from her elbow problems, yet she is still employed by the same employer and has received promotions and substantial salary increases since the accident. Although her physician assigned her a 40% disability (in performing non-sedentary work) due to the arm problems, she apparently is able to perform the functions of her particular job adequately. There is no showing she is permanently disabled as a result of the injuries to the arm. Her physicians felt there was little chance the staph infection would recur and were very optimistic about her recovery.
*825 Considering the foregoing, we conclude the trial court abused its discretion in the award of $400,000 in general damages. Although plaintiff certainly has suffered much pain, inconvenience, anxiety, and alteration of her lifestyle, in our opinion the award is clearly excessive and is not justified by the facts.
Our review of damage awards made during the last five years discloses no cases in which the injuries were truly similar to plaintiff's. We note, however, that even awards for injuries more serious and of longer duration than plaintiff's seldom reach the amount awarded in this case.
For all the reasons stated above, we conclude the highest award that could reasonably be made for the injuries suffered by this plaintiff is $200,000.

FUTURE LOSS OF EARNING CAPACITY
In her answer to the appeal, Mrs. Teague asserts the trial court erred in failing to award her damages for future loss of earning capacity.
In the reasons for judgment, the trial court stated,
I do feel that the plaintiff is on her way to a normal life. She will receive her back wages, and I see no reason why she cannot be gainfully employed. On this account, I agree with the defendant that she is entitled to no future lost wages. Any wages lost will be offset by a general damage award; therefore, I do not feel that an award for future loss of wages is necessary.
The evidence establishes that, despite the many problems caused by her elbow injury and long periods of sick leave, Mrs. Teague is still employed by the Delchamps supermarket chain. Further, her wages have gone from $4.00 per hour at the time of the accident to $11.00 per hour at the time of trial and she has been promoted from cashier-checker to assistant manager.
The fact that Mrs. Teague was on sick leave at the time of the trial resulted from her recent hysterectomy rather than her elbow problems. There was no evidence that she would not be able to return to work after a reasonable recovery period. Nor was there any clear evidence that she would be incapacitated in the future because of the elbow. Doctors Gessner and Gartsman both testified there is only a remote possibility the staph infection will recur.
Speculation, probabilities and conjecture cannot form the basis for an award for loss of future earnings. See Chaney v. Our Lady of Fatima Cath. Church, 391 So.2d 501 (La.App. 3 Cir.1980). Although a loss of future earning capacity need not be proved with mathematical certainty, there must be such proof as reasonably establishes the claim. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971).
On the evidence presented, therefore, we find no manifest error in the trial court's refusal to make an award for future loss of earning capacity.
For the foregoing reasons, therefore, the amended judgment of March 19, 1987, is vacated. The judgment of February 24, 1987, is reinstated, with revisions, and in all other respects is affirmed. The costs of this appeal are assessed against the appellant. The judgment of February 24, 1987, is recast as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Judy M. Teague, and against the defendants, Apartment Rental Consultants, Inc. d/b/a Trademark Property Management, and its insurance carrier, American Employer's Insurance Company, in the amount of TWO HUNDRED SEVENTY-FOUR THOUSAND FOUR HUNDRED EIGHTY-FOUR AND FOUR HUNDREDTHS ($274,484.04) DOLLARS, jointly, severally and in solido, together with legal interest from date of judicial demand until paid, and for all costs of these proceedings.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all expert fees be and are hereby taxed as court costs in the amount of THREE HUNDRED AND NO HUNDREDTHS ($300.00) DOLLARS each, for those experts *826 who appeared in court to testify, and ONE HUNDRED FIFTY AND NO HUNDREDTHS ($150.00) DOLLARS each, for those experts who testified by deposition.
JUDGMENT OF MARCH 19, 1987, VACATED; JUDGMENT OF FEBRUARY 24, 1987, REINSTATED, REVISED, AND RECAST.
NOTES
[1] Trademark managed the property under a written contract with the owners, Alfred M. Barnes Jr. and John P. Barnes. Under the management contract, Trademark assumed responsibility not only for maintaining the property and making all repairs, but also for providing comprehensive general liability insurance in the owners' names. Although the Barnses were named defendants in the original petition, they obtained summary judgment dismissing them from the suit.