**Mrs. Myra Kennedy, wife of/and Jack KENNEDY**

v.

**UNITED STATES of America.**

**Civ. A. No. 88–1922.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

July 23, 1990.

As Corrected July 30, 1990.

Lawrence S. Kullman, Lewis & Kullman, New Orleans, La., Robert C. Thomas, Natchitoches, La., for plaintiffs.

Asst. U.S. Atty. John R. Halliburton, Shreveport, La., for defendant.

## MEMORANDUM OPINION

STAGG, Chief Judge.

This is an action for compensatory damages for personal injuries allegedly caused by the medical malpractice of personnel of the United States government at Barksdale Air Force Base, Bossier City, Louisiana.

Plaintiffs, Myra Kennedy and her husband, Jack Kennedy, filed suit under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.*, alleging negligent failure to diagnose Mrs. Kennedy's breast cancer soon enough so that her cancer might have been cured. The case was tried to the bench on April 12, 1990. Pursuant to the stipulations, depositions, testimony and post-trial briefs, the court hereby makes the following findings of fact and conclusions of law.

Mrs. Kennedy was born on October 20, 1941, and is now 48 years old. She has been married but once, and then to Jack Kennedy, also a plaintiff herein. At all material times, Mr. Kennedy was employed by the United States Air Force with the rank of Chief Master Sergeant and was assigned to Barksdale Air Force Base, until his retirement from the Air Force on February 19, 1987. Like many women, Mrs. Kennedy periodically performed breast self-examinations for the purpose of detecting lumps in her breasts. Mrs. Kennedy, in fact, found a lump in her left breast on April 19, 1983. Two days later, she presented to the Family Practice Clinic at Barksdale for evaluation of her condition.

Mrs. Kennedy's primary physician at Barksdale was Dr. Dan LaFleur. After waiting over two hours to see Dr. LaFleur, a nurse told Mrs. Kennedy that Dr. La-Fleur had been called to the emergency room, but would see Mrs. Kennedy as soon as possible. When Mrs. Kennedy asked if she could see someone else, the nurse told Mrs. Kennedy that she could see Maj. Brenda J. La Orange. Major La Orange was not a doctor, but a primary care nurse practitioner.[1]

Major La Orange examined Mrs. Kennedy's left breast and confirmed the presence of a small lump. Major La Orange then called in two doctors from the clinic who also examined Mrs. Kennedy's breast.[2]

The doctors advised Mrs. Kennedy not to worry, but instructed her to get a mammogram to rule out cancer. Major La Orange's notations on plaintiff's medical records indicate that Major La Orange was unable to find the borders of the lump and, therefore, unable to measure the lump. Mrs. Kennedy was referred to a private hospital for a mammogram. No one said anything to Mrs. Kennedy about monitoring the lump or returning to see a doctor.[3] She was told, however, that if she needed to know anything Dr. LaFleur would get in touch with her. The independent radiologist who conducted the mammogram told Mrs. Kennedy that the mammogram looked fine and that she should go home and not worry.

On August 4, 1983, Mrs. Kennedy returned to the Barksdale Clinic for a P.A.P. Smear and endometrial biopsy to evaluate an unrelated gynecological condition. There is a substantial conflict in the evidence regarding whether Mrs. Kennedy's breasts were examined during this visit. According to Dr. LaFleur's records, a breast examination was done, the result of which was normal. The records also indicate that a negative mammogram report was reviewed. Medical records do not indicate that any additional treatment or follow-up was recommended. Dr. LaFleur testified that he did not see or evaluate Mrs. Kennedy after August 4, 1983.

Mrs. Kennedy, on the other hand, testified unequivocally that no breast examination was performed by Dr. LaFleur on August 4, 1983. According to Mrs. Kennedy, she went to see Dr. LaFleur because of vaginal bleeding and did not mention her breast, as she had been told not to worry about the lump. This conflict in testimony is substantial, but, for several reasons, must be resolved in favor of Mrs. Kennedy. First, Mrs. Kennedy had an independent

---

**1.** A nurse practitioner is a registered nurse who completes additional education and training.

**2.** The medical records do not confirm that these two doctors, whose names are unknown, examined Mrs. Kennedy. No medical personnel, however, had any independent recollection of their treatment of Mrs. Kennedy. Mrs. Kenne-

dy testified that the two doctors did in fact examine her breast and felt the lump in question. Mrs. Kennedy was a truthful witness and there is no basis in the record to question her credibility.

**3.** This was a deviation from the applicable standard of care. *See* note 6, *infra.*

recollection of the events surrounding her examination and treatment on this particular day. Dr. LaFleur did not. Second, Dr. LaFleur's notations on the medical records for this date are nearly illegible and, in the court's opinion, ambiguous. Third, the evidence indicates that the lump was malignant in April of 1983 and continued to grow larger over time. This is inconsistent with the notion that the lump had gone away by August 4, 1983. Finally, the court believes that Dr. LaFleur's testimony that a breast examination took place may have been influenced by his awareness that such an examination should have been performed.

Mrs. Kennedy continued to do breast self-examinations. On August 14, 1984, she returned to the Barksdale Clinic, complaining that the lump had grown even larger. She was examined by Dr. Stanley Jones, who found a lump in the same location noted earlier by Major La Orange. The lump was described as a 2x3 centimeter freely-movable, non-tender mass near the left nipple. In a clear deviation from the standard of care applicable in evaluating breast lumps,[4] Dr. Jones did not order a biopsy; instead, he ordered a repeat mammogram at an independent institution, the result of which was negative. Mrs. Kennedy was again sent home and told not to worry. Dr. Jones dismissed the lump as fibrocystic disease. Although the medical records indicate that Mrs. Kennedy was told to return in six months, she did not return until October 23, 1985. Mrs. Kennedy had no independent recollection of Dr. Jones telling her to return, as indicated in the medical records.

It is clear that Mrs. Kennedy returned to the Clinic on October 23, 1985, because her breast had started to crease toward the lump, and the lump was getting larger. She was again examined by Dr. Jones. After an initial examination, Dr. Jones left the room to consult with a surgeon, Dr. Larry Killebrew. Dr. Killebrew immediately suspected that the lump was malignant. He performed a biopsy three days later, confirming the malignancy in Mrs. Kennedy's left breast. Dr. Killebrew then performed a modified radical mastectomy on the left breast on November 1, 1985. Unfortunately, Mrs. Kennedy's cancer had metastasized prior to the surgery.

Following the mastectomy, Mrs. Kennedy continued to be monitored by physicians at the Barksdale Clinic until February, 1988, when a routine chest x-ray showed a nodule in the upper lobe of her left lung. Mrs. Kennedy was referred for consultation to Dr. James Ciaravella. Dr. Ciaravella admitted Mrs. Kennedy to Schumpert Medical Center in Shreveport, Louisiana, for evaluation on February 29, 1988. A bone and CAT scan were performed, which indicated that Mrs. Kennedy breast cancer had metastasized to her sternum. The presence of cancer was confirmed on March 3, 1988 following an open sternal biopsy. Pathologists who examined the biopsy sample taken from Mrs. Kennedy's sternum compared the sample to the pathological slide taken in connection with her breast biopsy and confirmed that the cancer in the sternum was, in fact, a metastasis of Mrs. Kennedy's original breast cancer. She was next examined by Dr. Christopher McDonald on March 3, 1988, a specialist in the field of medical oncology. Dr. McDonald also determined that Mrs. Kennedy probably had recurrent carcinoma of the breast with metastasis to the sternum and lung. He prescribed for Mrs. Kennedy a hormonal chemotherapy agent, Tamoxifen, which has continued to this date. She also received a course of radiation therapy under the care of Dr. Stephen Hightower to relieve pain in her sternum. Additionally, she received six courses of adjuvent chemotherapy administered over a four-week period under the supervision of Dr. McDonald. In September of 1988, Mr. and Mrs. Kennedy moved to Pennsylvania, where Mrs. Kennedy has been under the care of Dr. Frederick Kass. As mentioned, Dr. Kass has continued to treat Mrs. Kennedy's cancer with Tamoxifen. Although her cancer is in remission, such remission is temporary. The evidence is clear that Mrs. Kennedy's breast cancer will, in the not-too-distant future, result in her death.

---

**4.** The standard of care is discussed at page 9, *infra.*

■ Under the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674; *Sewell v. United States*, 629 F.Supp. 448, 451 (W.D.La.1986). The appropriate law to follow in determining liability under the FTCA is the law of Louisiana, where the negligent act is alleged to have occurred. *Sewell, supra.* The controlling Louisiana provisions are found in La.Rev.Stat. 9:2794, which provides, generally, that in an action based on the malpractice of a physician, the plaintiff has the burden of proving: (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the State of Louisiana and actively practicing in a similar community or locale and under similar circumstances; [5] (2) that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

■ Louisiana law further provides that every person is responsible, not only for damages occasioned by his own act, but also for damages caused by the acts of persons for whom he is answerable. La. Civ.Code art. 2317. Under Louisiana law, an employer is responsible for the damages occasioned by his employees in the exercise of their duties. La.Civ.Code art. 2320. Louisiana courts apply a duty-risk analysis in assessing liability under these articles of the Civil Code. *See Biggs v. United States*, 655 F.Supp. 1093, 1094 (W.D.La. 1987). Under the duty-risk analysis, the plaintiff must demonstrate: (1) that the hospital's actions were a cause in fact of injury; (2) that the hospital owed plaintiff a duty which was imposed to protect against the risk involved; (3) that the hospital breached that duty; and (4) that plaintiff

suffered an injury. *See also Swartzlander v. Hunt Laboratory, Inc.*, 552 So.2d 1339, 1342 (La.App. 5th Cir.1989), *writ denied*, 556 So.2d 1280 (La.1990). To meet the causation requirement in a malpractice action, a plaintiff must prove that the defendant's actions were a substantial cause in fact of the injury. *Dimitry v. United States*, 893 F.2d 666, 668 (5th Cir.1989).

■ Medical testimony unequivocally establishes that the standard of care relevant to the diagnosis and treatment of breast lumps is uniform. Thus, the standard of care is the same for family practitioners, internists, oncologists and surgeons. These procedures are taught to all students in medical school at a very early phase of their training. The steps required to conform to that standard of care were also clearly established by the testimony. Basically, there are two ways to distinguish a lump in the breast from cancer: (1) a clinical examination; or (2) a biopsy. However, clinical examinations are inadequate unless the lump goes away. If the lump remains in the breast over time, a clinical examination cannot distinguish the lump from cancer, and a biopsy is mandatory. Instead of performing a biopsy (or a fine needle aspiration), the medical personnel at Barksdale referred Mrs. Kennedy for mammograms. This was a gross deviation from the relevant standard of care. The testimony clearly establishes that it is never appropriate to use a mammogram as a way to avoid performing a biopsy on a lump in the breast. This is so because a lump in the breast cannot be judged either malignant or nonmalignant simply by way of a mammogram. In fact, the danger of missing a malignancy is so great using a mammogram that even if the mammogram is negative, the lump needs to be biopsied. Mammograms, therefore, may confirm the presence of a cancer in a suspicious lump, but cannot be used to rule out cancer. Mammograms are particularly helpful in examining other areas of the breast prior

---

5. However, where the defendant practiced in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians in the involved medical specialty. *Id.*

to doing a biopsy on a lump to ensure that there are no other small lumps that need to be biopsied at the same time. The Barksdale Clinic, unfortunately, used mammograms to rule out malignancies in breast lumps. Major La Orange's testimony confirms this:

Q.: Was it your understanding at the time, Mrs. La Orange, that the mammogram could assist in ruling out whether this mass was malignant or not?

A.: That would have been one of the routine or ordinary tests that would have been done for them.

Q.: That was routinely done at the Air Force at the time, that is to use a mammogram to rule out a mass as being malignant?

A.: I can't speak for the Air Force. I know in my clinic that was routine.

La Orange Deposition at 18–19.

■ Having determine that the Barksdale personnel deviated from the standard of care in diagnosing and treating the lump in Mrs. Kennedy's breast, the court now turns to the issue of causation. The testimony on this point is clear as well. The testimony established that the cancer discovered through the biopsy in 1985 was present in Mrs. Kennedy's breast during her initial presentation to the Barksdale Clinic in April of 1983 and was diagnosable at that time. Plaintiffs' expert, Dr. William Stein III, a medical oncologist specializing in the diagnosis and treatment of cancer, stated that it is a medical certainty that Mrs. Kennedy is going to die of breast cancer. He further opined that Mrs. Kennedy lost a significant chance of survival by the delay occasioned in diagnosing and treating Mrs. Kennedy's condition.[6] Had she been operated on in 1983, the chance of

a cure for Mrs. Kennedy would have been about 90 per cent, according to Dr. Stein. Had she been operated on in 1984, the chance of cure would have been as high as about 80 per cent. Of course, Mrs. Kennedy has already survived five years since her surgery. This, unfortunately, is temporary. The testimony establishes that more likely than not, in a short period of time—i.e., several months to a year—hormonal therapy will no longer control the disease, and cancer will reoccur in Mrs. Kennedy's bones and lung.[7] If the cancer reoccurred in Mrs. Kennedy's bones, she would be disabled and in extreme pain. Death does not come quickly from bone cancer. If the cancer reoccurred in her lung, more likely than not Mrs. Kennedy would die from suffocation. Plaintiff, still a relatively young woman, will not survive much longer. Testimony establishes that she will die from her disease in approximately 24 to 30 months.

The court now turns to the issue of damages. Under Louisiana law, the tortfeasor is under obligation to compensate its victims for the damage done. Sewell, supra, at 463. In this case, plaintiffs have established damages for past medical expenses, future medical expenses, general damages for mental and physical pain and suffering and loss of consortium. Before attempting to approximate the damages that the plaintiffs have proved are more probable than not, the court must address two remaining issues: (1) the applicability of the $500,000 limitation on liability found in the Louisiana Medical Malpractice Act, La.Rev.Stat. 40:1299.42(B)(1); and (2) whether Mrs. Kennedy's recovery is affected by the collateral source rule.

■ In suits under the FTCA, a plaintiff may recover only to the extent that the

---

**6.** The court pauses to note that had Mrs. Kennedy returned to the Barksdale Clinic within six months from the date of her August 22, 1984 examination, as provided on the medical records, Mrs. Kennedy's condition may not be as serious as it is today. The court, however, perceives no negligence on Mrs. Kennedy's part in this regard. In deviating from the appropriate standard of care, the Barksdale personnel *never* impressed upon Mrs. Kennedy the seriousness of her condition and the importance of

routine doctor visits in evaluating her condition. Although patients clearly have a role to play in the diagnosis and treatment of their conditions, it is the physician's responsibility to assure that the patient understands the nature and importance of that role.

**7.** The testimony also established a possibility that the cancer would reoccur in Mrs. Kennedy's brain.

federal government has waived its sovereign immunity. *Lucas v. United States*, 807 F.2d 414, 417 (5th Cir.1986). Congress has determined that the federal government shall be liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *Lucas, supra.* Under the Louisiana Medical Malpractice Act, damages recoverable against "qualified" health care providers are limited. *See* La.Rev.Stat. 40:1299.42(B). The Act defines health care provider to mean a person, partnership, corporation, facility, or institution licensed by the State to provide health care or professional services. *Id.* at 40:1299.41(A)(1). In order to "qualify" under the Act, a health care provider is required to do two things: (1) it must file with the State Commissioner of Insurance "proof of financial responsibility," which is defined as proof that provider has a malpractice insurance policy of at least $100,-000 per claim, or, if the provider is self-insured, proof of financial responsibility in excess of $100,000; and (2) it must pay a "surcharge," to maintain the patient compensation fund. Once the health care provider has qualified under the Act, its liability is limited as set forth in the Act.[8]

■ It does not matter that the Barksdale Air Force Base Clinic was not a qualified health care provider under the Act, because Louisiana's intended coverage in the Act cannot control the scope of the federal government's waiver of sovereign immunity. Recent jurisprudence supports this position. In *Lucas, supra,* the Fifth Circuit was confronted with the question of whether the malpractice limitation in Texas applied to the United States, where the Texas statute expressly excluded federally-operated institutions from its coverage. The Court stated:

Texas law informs how a private party would be treated; it does not tell us,

indeed it cannot, the extent to which the federal government has waived its sovereign immunity. By excluding federally operated institutions from coverage ..., the Texas legislature simply acknowledged the limit of its power. The Federal Tort Claims Act assures the federal government of that treatment accorded private parties in Texas. Hospitals and health care providers licensed in Texas are subject to the ... liability limit. Therefore, [the liability limit] also applies to a federally operated hospital under the Federal Tort Claims Act.

*Lucas, supra,* at 417.

The Ninth Circuit has reached a similar conclusion. In *Taylor v. United States*, 821 F.2d 1428 (9th Cir.1987), *cert denied*, 485 U.S. 992, 108 S.Ct. 1300, 99 L.Ed.2d 510 (1988), the Court concluded that California's malpractice limitation applied to claims under the FTCA against federal health care facilities in California. The Court stated that the only reason the Army hospital and its staff were not licensed under California law is that California lacks power to require licensing of federal health care providers and physicians. According to the Court, the United States has, by virtue of the Supremacy Clause, essentially deemed the Army Hospital and its staff fit to provide health care services in California. The Court provided:

To hold that [the liability limit] does not apply to the United States because the United States is exempt from state licensing requirements would contravene Congress' directive that the United States "shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...."

*Id.* at 1432. Thus, the *Taylor* court found that the liability limitation found in the California Civil Code applied to the plain-

---

8. Specifically, the Act places a $100,000 limit on a health care provider's liability, but also provides a $400,000 supplemental amount available to each injured person payable from the state-operated fund. Thus, the total amount recoverable may not exceed $500,000, and any damages in excess of $100,000 are payable from the fund. *See Savelle v. Heilbrunn*, 552 So.2d 52, 55 (La.

App. 3d Cir.1989), *writ denied*, 556 So.2d 1267 (La.1990). In this case, the court must deal only with the $500,000 limitation. The federal government cannot be compelled by the State to contribute to the patient compensation fund and, therefore, the United States does not claim an entitlement to the $100,000 limitation.

tiff's action against the United States for damages arising out of the negligent treatment of her husband. Based on the above-cited authorities, the court holds that the United States has met its burden of demonstrating the applicability of the $500,000 liability limitation to this medical malpractice action against the United States.[9]

The court now turns briefly to the collateral source rule. Louisiana jurisprudence is well settled that a plaintiff's tort recovery is not diminished by payments made through insurance benefits received from other collateral sources independent of the tortfeasor's procuration or contribution, and such payments may not be credited against the personal injury award. *Teague v. Barnes*, 519 So.2d 817, 822–23 (La.App. 5th Cir.1988). In this case, the court must determine whether benefits received from the Civilian Health and Medical Program of the Uniformed Services ["CHAMPUS"] are a collateral source to an FTCA award. This is not the first time the court has addressed this issue. In a bench ruling rendered on May 17, 1988, in *Shirley Kinney v. United States*, Civil Action No. 86–3144, the court held that payments made from CHAMPUS are not from a source collateral to the United States. (Transcript at page 149–50.) In so holding, the court relied on the Tenth Circuit decision of *Mays v. United States*, 806 F.2d 976 (10th Cir.1986), *cert. denied*, 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987), which remains the only court of appeals decision squarely to address this issue. In holding that CHAMPUS payments are not from a source collateral to the United States, the *Mays* court noted that all of the money for the CHAMPUS program comes from the general treasury of the United States, and no money is paid directly into the fund by the recipients of CHAMPUS benefits. *Mays* remains good law, and the court declines the invitation to retreat from its previous position. Accordingly, the court holds that CHAMPUS payments are not from a source collateral to the United States, and to award damages for a loss for which the United States has already compensated (and will compensate) the plaintiffs would constitute an impermissible double recovery.

The last task is to assess a fair and reasonable amount of damages. As set forth earlier, the testimony established that the erroneous diagnosis and treatment of the malignant lump in Mrs. Kennedy's breast significantly decreased her chance of survival. Mrs. Kennedy will, in fact, die from her condition, although it is unclear how much longer she will survive. Plaintiff has also suffered intense mental and physical pain, as well as a surprisingly small amount of past medical expenses. Mrs. Kennedy's past medical expenses total $14,833.60. Of that amount, defendant has already paid, through CHAMPUS, $11,351.68. Thus, the total recoverable amount paid by plaintiffs for Mrs. Kennedy's medical expenses is $3,376.92. In the court's view, Mrs. Kennedy's loss of at least twenty years of life expectancy as well as the intense mental and physical pain and suffering she has and will endure justifies an additional award of $400,000. The $500,000 limitation, as mentioned, does not include future medical damages. The testimony indicates that Mrs. Kennedy's future medical expenses will, more likely than not, range from $70,000 to $250,000. The court finds that an award of $125,000 would be appropriate. Mr. Kennedy testified that CHAMPUS pays 75 per cent of all allowable[10] medical expenses. Plaintiffs, therefore, are entitled to recover only 25 per cent of $125,000, or $31,250. As for Mr. Kennedy's claim for loss of consortium,[11]

---

9. Of course, the $500,000 limitation does not include future medical care and related benefits. *See* La.Rev.Stat. 40:1299.42(B)(1).

10. There was insufficient proof that Mrs. Kennedy would undergo experimental treatment not covered by CHAMPUS. Considering the payments made to Mrs. Kennedy in the past, the court finds that the amount awarded would be allowable.

11. A claim for loss of consortium has been outlined to include: (1) love and affection; (2) society and companionship; (3) sexual relations; (4) material services; (5) financial support; and (6) aid and assistance. *Carroll v. St. Paul Insurance*, 550 So.2d 787, 792 (La.App. 2d Cir.1989).

the court finds that an award of $100,000 would be appropriate. This amount is reasonable considering the loss of society and services that Mr. Kennedy can expect as the result of the reoccurrence of cancer in other parts of his wife's body, as well as her premature death. Thus, the total amount awarded to plaintiffs herein, exclusive of future medical expenses, totals $503,376.92. This amount must be reduced to $500,000 in accordance with the Louisiana Medical Malpractice Act.[12]

Counsel for plaintiff is instructed to submit a proposed judgment, approved by counsel for the defendant, within twenty (20) days of the date of this opinion. The judgment should award costs and interest to plaintiffs, as allowed by law.

THUS DONE AND SIGNED.

---

**12.** The $500,000 limitation operates as a cap on the *total* amount recoverable for *all* claims arising out of the injuries to Mrs. Kennedy. *La-*

*Mark v. NME Hospitals, Inc.*, 542 So.2d 753, 756 (La.App. 4th Cir.1989), *writ denied,* 551 So.2d 1334 (La.1989).