**Eugene Frederick SIMMONS and Winnie Simmons,**

v.

**UNITED STATES of America, et al.**

**Civ. A. No. 91–1435.**

United States District Court,
W.D. Louisiana,
Alexandria Division.

Nov. 2, 1993.

Jimmy Wayne Wiley, Winnfield, LA, for plaintiffs.

John Robert Halliburton, U.S. Attorney's Office, Shreveport, LA, for U.S.

*REASONS FOR JUDGMENT*

LITTLE, District Judge.

Eugene Simmons ("Simmons") brought this medical malpractice action against the United States of America to recover for injuries he allegedly sustained while a patient at the Veterans' Administration Hospital in Shreveport, Louisiana (the "VA Hospital" or "hospital"). Upon review of the evidence presented at trial, as well as the parties' pleadings and memoranda of law, the court concludes that Simmons has not established liability of the United States. The following constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

I.

On 25 January 1988, Simmons drove to the VA Hospital for care of his chronic, poorly controlled diabetes and for evaluation and treatment of persistent left arm and leg weakness. Upon examination, doctors discovered that Simmons' blood sugar was dangerously high and admitted him to the hospital. In order to help control his blood sugar, Simmons was given intravenous fluids through a needle inserted in his left hand.

On 27 January, Simmons' doctors discontinued intravenous fluids but maintained the needle in his hand by means of a heparin lock.[1] On 28 January, a neurologist interviewed Simmons and noted a history of numbness and weakness on the patient's left side dating from early 1987 and a history of headaches and periods of unconsciousness beginning in 1961. The neurologist carefully examined Simmons' left extremities—including his left hand—but noted no infection or swelling. During morning rounds on 29 January, the treating physician concluded that Simmons' blood sugar had stabilized. The physician ordered Simmons discharged from the hospital. A nurse removed the needle from Simmons' hand in anticipation of the discharge.

Simmons was officially discharged from the VA Hospital at 1:00 p.m. on 29 January 1988. He did not exit the hospital, but he was found lying unconscious in his room several hours later. His body temperature was 102°, and his left hand was markedly red and swollen around the former intravenous needle site. He was readmitted to the hospital and placed in the intensive care unit. There he received a course of antibiotics and intravenous fluids.

On 30 January 1988, Simmons regained consciousness and complained of pain in his left hand. Doctors noted that, despite the antibiotics, an abscess was forming at the former intravenous needle site. On 2 February, Simmons' doctors determined that the abscess would require surgical intervention and consulted a VA Hospital surgeon. On 4 February, the surgeon made a five centimeter incision on the back of Simmons' hand and drained the abscess. The procedure took place under local anesthetic, in a treatment room near Simmons' hospital room. Simmons lost no tissue as a result of the drainage. On 11 February, doctors concluded that Simmons' blood sugar had stabilized and discharged him from the VA Hospital.

After his discharge, Simmons filed a claim with the Veterans' Administration seeking damages associated with the development of the subcutaneous abscess in his left hand. This claim was ultimately denied. Simmons then brought the instant lawsuit, alleging that employees of the VA Hospital were negligent in failing to prevent and/or discover and treat promptly the infection that developed at the intravenous needle site. Simmons alleged that this failure of care led to his fever and unconsciousness and necessitated the incision and drainage procedure. As a result, he sustained pain, suffering, and permanent injury—manifested by weakness and numbness in his left hand.

II.

The Federal Tort Claims Act subjects the United States and its agencies (such as the

---

1. A heparin lock is used when doctors wish to terminate temporarily the flow of intravenous fluids to a patient. It entails placing a cap upon the open air end of an intravenous needle and removing the associated tube and bag. The cap may be removed later, the tube and bag replaced, and intravenous fluids readministered. Thus, the pain associated with establishing a new needle site is reduced, if not eliminated.

Veterans' Administration) to liability for torts "in the same manner and to the same extent" as a private person would be liable under like circumstances. 28 U.S.C. § 2674 (1993). The relevant acts and omissions in this case took place in Louisiana; therefore, Louisiana substantive law guides our determination of the legal issues. *See Thomas v. Calavar Corp.*, 679 F.2d 416, 418 (5th Cir. 1982).

▆ Under Louisiana law, a hospital may be held liable for damage caused by its employees' negligence, but the plaintiff must first establish the employees' negligence or malpractice. *Kennedy v. United States*, 750 F.Supp. 206, 210 (W.D.La.1990). To do so, the plaintiff must prove that: (i) the defendant owed the plaintiff a duty to protect against the risk involved, (ii) the defendant breached that duty, and (iii), as a "proximate result," the plaintiff suffered injuries that "would not otherwise have been incurred." *Smith v. State ex rel. Dep't of Health & Human Resources Admin.*, 523 So.2d 815, 819 (La.1988); La.Rev.Stat.Ann. § 9:2794(A)(3) (West 1993).

▆ As adduced at trial, an infection is a recognized risk of intravenous needle use; thus, to the extent possible, hospital employees must exercise care to protect against infection at the needle site. Proper prophylactic care includes: cleaning the proposed site of the intravenous needle, using a sterile needle, dressing the site with clean gauze, examining the dressing and needle with each fluid change, and changing or removing the needle after three to five days of continuous use. As is clear from the nurses' records and testimony at trial, these standards were met in the present case.

As further recognized at trial, however, proper prophylactic care does not eliminate all chance of developing an infection. Thus, hospital employees must be alert to recognize infections and call them to the attention of the patient's treating physician. In the present case, nurses monitored Simmons' intravenous fluids on a daily basis until 27 January when the heparin lock was applied; they noted no redness or swelling at the needle site. A neurologist carefully examined Simmons' left hand on 28 January, but noted no redness or swelling. Simmons' treating physician examined him on the morning of 29 January, but noted no redness or swelling of his left hand. This leads to the conclusion that the infection in Simmons' hand developed sometime after morning rounds on 29 January 1988—probably at the time the nurse removed the intravenous needle.[2]

Soon after the needle was removed from his hand, Simmons informed the nursing staff that he had his truck at the hospital and would drive himself home. He was then seen getting dressed. At that point, there was simply no reason for the hospital employees to continue to monitor Simmons' condition. *See Pitre v. Opelousas Gen. Hosp.*, 530 So.2d 1151, 1157 (La.1988) (medical professionals owe a duty to avoid acts or omissions which they reasonably foresee could result in injury). Although it was clearly foreseeable that Simmons might develop an infection at the needle site and require additional care, it was not foreseeable that Simmons would fall unconscious and be unable to recognize signs of the infection. His blood sugar was back under control, and, according to experts at trial, it was unlikely that a hand infection would lead to unconsciousness. Moreover, even if hospital employees had discovered Simmons' hand infection as soon as it became manifest, it is unclear whether the immediate administration of antibiotics could have prevented the abscess from developing and obviated the pain and suffering associated with the incision and drainage procedure. *See Ruff v. Bossier Medical Ctr.*, 952 F.2d 138, 140 (5th Cir.1992) (to recover for injury, plaintiff must prove that defendant's conduct was a "substantial factor" in causing the untoward result). Simmons failed to present any evidence in this regard.

The court concludes that the steps doctors took in treating Simmons' hand infection were both adequate and competently performed. Doctors administered large doses of antibiotics, and when these were ineffective and an abscess formed, incised and drained

---

2. Although Simmons' hand was markedly red and swollen at 4:00 p.m. on 29 January, experts at trial agreed that this condition may have developed in only a few hours.

the abscess. Simmons' hand healed without further incident. It is undisputed that Simmons now suffers from weakness and numbness on his left side and that his motor skills have significantly deteriorated. The weight of the evidence has established that it is unlikely that these disabilities resulted from the infection he sustained or the care he received at the VA Hospital.

## III.

For the foregoing reasons, the court renders judgment in favor of the defendant United States of America.