725 So.2d 539 (1998)
Clint Raymond YOUNG and Gwendolyn Marie Smith Gobert, Individually and on Behalf of their minor daughter, Brittany T. Young
v.
LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY and Maria A. Cortez, M.D.
No. 98-CA-522
Court of Appeal of Louisiana, Fifth Circuit.
December 16, 1998.
*540 Harry T. Widmann, Metairie, Louisiana, Attorney for Plaintiffs/Appellants.
Lloyd W. Hayes, Buckley & Hayes, New Orleans, Louisiana, Attorney for Defendant/Appellee Maria A. Cortez, M.D.
Before DUFRESNE, GOTHARD and EDWARDS, JJ.
GOTHARD, Judge.
Plaintiffs, Clint Young and Gwendolyn Gobert, individually and on behalf of their minor child Brittany Young, filed this suit against Dr. Maria Cortez and her insurer Louisiana Medical Malpractice Insurance Co., for obstetrical malpractice for injuries sustained by Brittany Young during labor and delivery. The trial court rendered judgment for plaintiffs and awarded Brittany Young $25,000.00 in general damages plus medical expenses. The trial court also awarded damages for mental anguish and emotional distress of $1,000.00 to Clint Young and $3,000.00 to Gwendolyn Gobert. The trial court found that the claim for loss of earning capacity was too speculative for an award of damages.
Plaintiffs appeal, alleging that all awards of damages were inadequate. Defendants filed an answer to the appeal, alleging that the trial court erred in finding that Dr. Cortez violated the applicable standard of care. Defendants further allege that there is no basis to award damages for mental anguish and emotional distress to Clint Young and Gwendolyn Gobert. For the following reasons, we find that the trial court erred in awarding damages and we amend the trial court's judgment to award general damages to Brittany Young in the amount of $100,000.00, and damages for emotional distress in the amount of $3,000.00 to Clint Young and $10,000.00 to Gwendolyn Gobert. In all other respects, the judgment of the trial court is affirmed.

*541 FACTS

Gwendolyn Gobert first consulted Dr. Maria Cortez on October 30, 1991. On November 29, 1991, Ms. Gobert's pregnancy test was positive. The pregnancy was relatively uncomplicated, and on July 2, 1992 Ms. Gobert was admitted to the hospital. Labor initially progressed normally, but during the delivery process, shoulder dystocia developed. In this condition, the baby's shoulder becomes impacted against the mother's pubic bone. As a result, the baby suffered injury to the brachial plexus nerve.
Plaintiffs requested a medical review panel, which was convened on September 22, 1994. The panel concluded that the evidence did not support a conclusion that the health care provider (Dr. Cortez) failed to meet the applicable standard of care. The panel found that the physician could not have reasonably anticipated that the delivery would have been difficult. The panel further found that, upon discovering shoulder dystocia, the physician properly managed the infant's delivery because the records and the physician's narrative showed that fundal pressure had been applied only after the infant's shoulders had been disimpacted. This suit followed.
At trial, Dr. Cortez testified about the events of delivery. She testified that during the labor process, the baby's head delivered without difficulty. While she was holding the baby's head, she requested that the mother push. The mother pushed, but delivery could not be accomplished. It was at this time that she discovered that the right (anterior) shoulder was impacted and the diagnosis of shoulder dystocia was made.
Dr. Cortez testified that she attempted to deliver the left (posterior) shoulder, but could not. She then attempted to place the shoulders in the oblique position, and when that was unsuccessful, she next attempted to rotate the shoulders, procedure called a Wood's screw maneuver. She had one hand on the baby's left chest and one on the back's left back, and she moved the left shoulder. She testified that, once the left shoulder was rotated, the right shoulder was freed and she then requested that the mother push and/or that the attending nurse apply fundal pressure (pushing on the abdomen). The infant's shoulders appeared and the remainder of the delivery progressed normally.
Dr. Cortez testified that she did not ask the mother to push and she did not request fundal pressure, once the diagnosis of shoulder dystocia was made, until after the right shoulder had been freed. Dr. Cortez admitted that when she placed the left shoulder in the oblique position, she could not feel the right shoulder. Dr. Cortez was asked about her deposition testimony, in which she had stated that she requested that the mother push prior to the freeing of the shoulder. Dr. Cortez explained that she had made the assumption that the shoulder was not freed at the time of giving her deposition, but changed her opinion prior to trial, based on her review of the medical records and the laws of physics. Also in her deposition, Dr. Cortez stated that she applied downward traction to the baby's head, during delivery, which she also denied at trial.
Dr. Cortez admitted that once a diagnosis of shoulder dystocia is made it is contraindicated to request the mother to push, or to request a nurse to apply fundal pressure, until after the shoulder is freed.
Dr. Cortez further testified that at the time of birth she noted that the baby's right arm was not moving as the left. About twenty minutes later, in the nursery, she noted a bruise by the heart on the right side. At that time, she requested an X-ray of the right shoulder. Other physicians noted bruising on both the anterior and posterior chest, on the right upper arm and under the armpit. It was diagnosed that as a result of shoulder dystocia, the infant had suffered a brachial plexus nerve injury. Such an injury occurs when the brachial plexus nerve is stretched during delivery.
Dr. Cortez also admitted at trial that she did not make a notation of her request for fundal pressure on the delivery chart, and that the notation of the application of fundal pressure was made by the nurse.
Dr. James O'Leary was qualified as an expert in the field of high risk obstetrics. He testified that he had written a book and several articles on shoulder dystocia. He testified that the request for the mother to *542 push, and/or a request for fundal pressure, while shoulder dystocia is present, falls below the standard of care required by obstetricians. The result of requesting fundal pressure in such a situation would be to make a shoulder dystocia more severe, by forcing the baby's shoulder tight against the pubic bone.
Dr. O'Leary testified that he reviewed the medical records and reports, the report submitted by Dr. Cortez to the medical review panel, the decision of the medical review panel and the deposition given by Dr. Cortez, and concluded that Dr. Cortez used improper techniques in the delivery of a shoulder that was stuck behind the mother's pubic bone. He noted that the hospital chart of delivery and Dr. Cortez's report to the medical review panel contained no mention of the use of the Wood's screw maneuver, although she described the use of that maneuver in her deposition. He concluded that, in this case, the improper use of traction and fundal pressure made a shoulder dystocia a much more severe shoulder dystocia and made delivery more complicated. Dr. O'Leary testified that the bruising on the infant's chest and back was most likely caused from the physician's hands in trying to rotate the shoulder. The bruising was consistent with the placing of the fingers in the armpit, a practice which was unacceptable because it could cause damage to the nerves in the armpit. Dr. O'Leary stated that these improper techniques used caused injury by stretching the brachial plexus nerve.
Dr. Juan Labadie and Dr. Harvey Gabert, both obstetricians, were members of the medical review panel who found that Dr. Cortez did not deviate from the standard of care in her handling of the shoulder dystocia during delivery. At trial, they both reaffirmed their decision.
At the time of trial the child, Brittany Young, was five years old and she did not testify.
Dr. Laxman Kawalramani was qualified as an expert in physical medicine and rehabilitation, electrodiagnostic medicine, and orthopaedic medicine with a special interest in spinal cord and peripheral nerve injuries. He evaluated Brittany on December 2, 1997. He noted that the child presented her left hand for a hand shake, however, she was able to shake with her right hand. She had asymmetrical bowing of the right neck shoulder angle, and her right scapula was slightly more prominent. The consistency of the soft tissue in her right shoulder was different from the left. There was evidence of terminal restriction of shoulder extension and abduction of ten to fifteen degrees. No specific sensory deficits were noted on the right upper extremity. She had partial drooping of the right upper lid, indicating the possibility of some sympathetic nerve fiber involvement. There was a flattening of the right triceps muscle and the right grip was weaker than the left. There was some discrepancy in limb length. Based on his observations, he diagnosed a residual right brachial plexus lesion as a result of a brachial plexus injury.
Dr. Kawalramani felt that the child had made good progress, and he recommended further testing and home therapy. He felt that she would continue to show improvement, but it was unlikely that the right side would reach the same capacity as the left. He could not predict if the limbs would eventually become equal in length. Dr. Kawalramani stated that Brittany's physical limitations would affect her on a competitive level, however if she were not at the competitive level she "can go by her life."
Brittany's father, Clint Young, testified that during the first year of Brittany's life he was angry, disappointed and scared, and he did not know if she would be able to use her arm. Since that time, she has improved a great deal. He stated that her right arm restrictions were noticeable to him, but that they are not noticeable to others unless they watched her for a while and really paid attention. He also testified that during the first year of Brittany's life the situation put a strain on the couple so that they broke up "off and on" during that first year.
Gwendolyn Gobert, Brittany's mother, testified that she was sent to the hospital, and labor was induced, on July 2, 1992. She said that it appeared that her delivery was going normally. She was told to push, and then she noticed some nervousness and she asked what was wrong. She was then told to push as hard as she could. Dr. Cortez then told her they needed to deliver that baby immediately. After that, she was not told to *543 push again. Ms. Gobert also testified that during delivery, one of the nurses was pressing against her stomach.
Immediately after birth, she noticed that her baby's right arm was held still. Later she observed that the arm was red and swollen. Within days of the birth, physical therapy was begun and she went for therapy for approximately one year.
Ms. Gobert testified that she was unable to return to employment for the first year and one-half after Brittany was born. She worries about Brittany's future. At the present time, Brittany tries to fit in with the other children, but is reluctant to engage in competitive activity which requires the use of both hands. Brittany does try to use her right hand, but does use the left hand for most tasks.
Tom Meunier was qualified as an expert in vocational rehabilitation counseling. He opined that, based on Brittany's race, socioeconomic status and family history, it would be most likely that she would finish high school and attend a two-year associate's program in college. Based on these factors and assumptions, Brittany would experience an earning capacity loss of 10-20% and that she would suffer a 40% loss of access to the job market. Dr. Melvin Wolfson was qualified as an expert in the field of economic forensics. The median annual salary of female high school graduates in 1998 was $16,148.00. He considered a work life expectancy of from age eighteen to age fifty-seven, and opined that the present value of her lifetime employment would be $279,403.00. A loss of 20%, at the present value, would equal $55,000.00.

ANALYSIS
Defendants, in their answer to the appeal, allege that the trial court committed manifest error in finding that Dr. Cortez committed medical malpractice during the delivery of Brittany Young.
To prove malpractice, a plaintiff must prove the prevailing standard of care, the health care provider's violation of that standard of care, and the causal connection between the health care provider's alleged negligence and the plaintiff's claimed injury. The standard of care is generally that degree of knowledge or skill possessed or the degree of care ordinarily exercised by doctors licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances. La. R.S. 9:2794; Lugenbuhl v. Dowling, 96-1575 (La.10/10/97), 701 So.2d 447.
Our Supreme Court recently restated the standard of factual review on appeal in Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, page 1176:
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder's conclusion was a reasonable one. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. (Citations omitted).
In this case, the plaintiffs established that the use of fundal pressure and/or a request to the mother to push during a delivery, when the condition of shoulder dystocia is present, deviated from the acceptable standard of care. In rendering her decision, the trial judge found that Dr. Cortez was not credible, and that her testimony differed from her deposition and differed from the statement she gave to the medical review panel. The trial judge found the testimony of Dr. O'Leary to be persuasive, and she found that Dr. Cortez breached the applicable standard of care by the use of improper techniques, namely traction and the application of fundal pressure to a delivery in which shoulder dystocia was present. Based on the *544 record before us, we cannot find that the trial court was manifestly erroneous or clearly wrong in these findings. Accordingly, we find defendants' allegation to be without merit.
Plaintiffs allege that the trial court committed manifest error by awarding inadequate damages.
In reviewing an award for damages, the trier of fact is vested with much discretion. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429 (La.1991). The reviewing court must look first, not to prior awards, but to the individual circumstances of the case before it, and only after an analysis of the facts and circumstances peculiar to the case before it and the individual involved therein may the reviewing court determine the appropriateness of the award. Ziegel v. South Central Bell, 93-547 (La.App. 5 Cir. 3/16/94), 635 So.2d 314. In the event the appellate court finds from the record an abuse of discretion, the award may be disturbed by raising it (or lowering it) to the lowest (or highest) point which is reasonably within the discretion afforded the trier of fact. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976).
In the present matter, the trial court noted that the child would have a residual limitation of her right arm and that this would hinder her in competitive activities. The child's mother testified that the child did try to use her right hand, but that she used her left hand for most activities. The child had intensive physical therapy for the first year of life, and Dr. Kawalramani did recommend that the child continue with home therapy at the time of trial. He further stated that the right arm would never fully develop and would always have some residual disability.
We find manifest error in the trial judge's award of $25,000.00 in general damages to Brittany Young. We believe that this award is insufficient to compensate the child for a lifetime of disability. Accordingly, we raise the award to $100,000.00, which we feel is the lowest amount which will compensate Brittany for the injuries sustained.
Plaintiffs next argue that the trial court erred in failing to award damages for loss of earning capacity and future earnings and damages for mental anguish based on loss of employment opportunities.
Before a plaintiff can recover for loss of future earning capacity, he must prove the loss, not with mathematical certainty, but with reasonable certainty. Future loss of earnings is inherently speculative, and must be proved with a reasonable degree of certainty; purely conjectural or uncertain future loss earnings will not be allowed. Bowens v. Patterson, 97-876 (La.App. 3 Cir. 6/3/98), 716 So.2d 69. See also Teague v. Barnes, 519 So.2d 817 (La.App. 5 Cir.1988).
In this case, the trial court refused to award damages for future loss of earning capacity and for mental anguish as a result. In order to reach the award, the experts had to speculate as to what Brittany would and would not be able to do, what level of education Brittany would achieve and what her salary would be. Thus, we find no manifest error in the trial judge's finding that any future lost wages for this five-year-old child was purely speculative.
Plaintiffs also allege that the trial court erred in limiting the awards for mental anguish and emotional distress to $1,000.00 to the father and $3,000.00 to the mother. In their answer, defendants alleged that these damages were not warranted because the parties did not prove emotional disturbance of a severe and debilitating nature.
A physician owes a duty to a father and mother not to negligently injure the child during the birth process. Skorlich v. East Jefferson Gen. Hosp., 478 So.2d 916 (La.App. 5th Cir.1985), cited in Clomon v. Monroe City School Bd., 572 So.2d 571 (La. 1990).
In this case, both parents testified to the fact that Brittany's physical limitations caused them to be fearful for her future. In addition, Ms. Gobert testified that she had to bring Brittany to physical therapy and that she was unable to work for a year, and these factors caused her mental anguish and emotional stress. While there was no testimony to show that the emotional disturbance suffered by the parties was severe and debilitating, there was testimony by the parties that *545 Brittany's condition did cause the parties to suffer mental anguish and stress. In addition, these injuries will continue to cause mental anguish and emotional distress as the child continues to undergo physical therapy and other medical needs, and as these parents continue to fear for the future of their child. Accordingly, we find that the trial court erred in its awards to the parents for damages for mental anguish and emotional distress, and we raise those awards to $10,000.00 to the mother and $3,000.00 to the father.

CONCLUSION
For the above discussed reasons the judgment of the trial court finding liability on the part of defendants is affirmed. The award of damages is amended to award $100,000.00 to Brittany Young for general damages, plus all medical expenses, court costs and legal interest; $10,000.00 to Gwendolyn Gobert for mental anguish and emotional distress; and, $3,000.00 to Clint Young for mental anguish and emotional distress. All costs are assessed against defendants.
AMENDED, AND AS AMENDED, AFFIRMED.